866 F.2d 162
 48 Fair Empl.Prac.Cas. 1444,
48 Empl. Prac. Dec. P 38,580, 57 USLW 2467
 N.A.A.C.P. (National Association for the Advancement of
Colored People); Walter Harris, on behalf of
himself and all others similarly
situated,
Plaintiffs-
Appellants,
Cross-Appellees,
v.
CITY OF MANSFIELD, OHIO; William Friend, in his individual
capacity and/or as Service Safety Director of
Mansfield, Ohio; et al., Defendants-Appellees,
and
City of Mansfield, Ohio, Defendant-Appellee, Cross-Appellant.
 Nos. 87-3216, 87-3287.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 17, 1988.
Decided Jan. 18, 1989.
 
 Edward L. Gilbert Co., LPA (argued), Akron, Ohio, Nina M. Najjar, James H. Banks, Columbus, Ohio, for appellants.
 Edward C. Kaminski, James D. Kurek (argued), Buckingham, Doolittle & Burroughs, Akron, Ohio, Charles D. Lynch, Asst. Law Director, Louise Busch, In her individual capacity and/or as Chairman of the Civil Service Com'n, Terry Kilgore, In his individual capacity and/or as Past Chairman of the Civil Com'n, Mansfield, Ohio, for appellees.
 Before KEITH, MARTIN and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 This is an interlocutory appeal and cross-appeal from a pretrial order of a district court granting in part and denying in part plaintiffs' petition for temporary injunctive relief in a case alleging racial discrimination in the process of hiring defendant City's firemen and policemen.
 
 
 2
 We affirm the district court's order and remand the case for further proceedings.
 
 I.
 
 3
 On March 21, 1986, plaintiffs-appellants N.A.A.C.P. and Walter Harris ("plaintiffs") filed a class action against defendant-appellee/cross-appellant City of Mansfield, Ohio, and various city officials ("defendants)".[1] Plaintiffs' claim is that the testing procedures used by the City to establish eligible candidates for its police and fire departments are racially discriminatory in violation of 42 U.S.C. Secs. 1981, 1983, 1985, and 1986. On February 5, 1987, plaintiffs filed a motion for a preliminary injunction to restrain the defendants from hiring any new policemen or firemen from the City's current eligibility list. The district court refused to enjoin additional hiring by the police department finding, inter alia,[2] "that the plaintiffs have failed to demonstrate a likelihood of success on the merits of their Section 1981 action with respect to the hiring practices employed by the City of Mansfield and the police department for entry level patrolmen positions." However, after finding "that the plaintiffs have demonstrated a strong likelihood of success on the merits of their Section 1981 claims with respect to the firefighter ... eligibility list, and will suffer irreparable injury if ... the city make[s] appointments from the current ... list," the court partially granted plaintiffs' motion to enjoin additional hiring by the fire department. Specifically, the court ordered the fire department to refrain from hiring any more than three new firefighters. In deciding not to enjoin the fire department entirely from hiring any more firefighters, the court concluded that "defendants have shown that harm to others and a countervailing of public interest weigh against the issuance of the injunction" as requested.
 
 
 4
 Both parties have appealed the court's decision. The central issues on appeal are (1) whether the district court's subsidiary factual determinations are clearly erroneous, and (2) whether the court abused its discretion by issuing the partial preliminary injunction.
 
 
 5
 We hold that the district court's findings of fact are not clearly erroneous and that the court did not abuse its discretion by not enjoining the City of Mansfield from filling vacancies in its police department. However, with respect to the injunction relating to firefighter positions, we conclude that a remand to the trial court is necessary because subsequent events have cast doubt upon the magnitude of the potential "harm to others" and the "countervailing public interest" that originally militated against a broader injunction.
 
 II.
 
 6
 Plaintiffs claim the testing procedures employed by the City of Mansfield in hiring policemen and firemen are a vehicle for discrimination. In particular, they challenge the written tests that were administered by the City's Civil Service Commission (CSC) and given to police and fire department applicants on March 22, 1986, the agility tests subsequently given to firefighter applicants who successfully completed the written test, the scoring of all three tests, and the lists of policemen and firefighter applicants who were certified by the CSC as being eligible for available positions.
 
 
 7
 The City of Mansfield is located in Richland County in north central Ohio. According to the 1980 census, Mansfield has a total population of 53,927, and a black population of 8,653 (sixteen percent). Richland County has a total population of 131,205, and a black population of 9,373 (seven percent). Thus, ninety-two percent of the blacks in Richland County live in the City of Mansfield. Statewide, blacks comprise 6.1% of the civilian labor force, and 6.1% of the aggregate police and fire positions.
 
 A.
 
 8
 The police department eligibility test is a written, multiple-choice examination consisting of 200 questions. It was composed by the Center for Criminal Justice (CSC) at Case Western Reserve University. Applicants who answer seventy percent of the questions correctly pass and may thereafter receive extra credit, in an amount equal to twenty percent of the applicant's score, for general college credit, law enforcement college credit, completion of a basic police training course, or professional law enforcement experience. The applicant must document his or her entitlement to the extra credit. The CSC scores the exam, computes any applicable extra credit points, and establishes the eligibility list, ranking applicants according to their cumulative scores. If there is an opening in the police department, the CSC certifies the names of the top three candidates from the eligibility list to the department for further review, including a personal interview, a psychological evaluation, and a polygraph test.
 
 B.
 
 9
 The fire department's test is somewhat different. While it includes a written, multiple-choice examination comprised of 200 questions composed, administered, and scored by the CSC, it also includes an agility test administered by fire department officials. Only those applicants who earn a score of seventy percent on the written test are eligible to take the agility test. Sixty percent of an applicant's overall score is based on his score on the written test, and forty percent is based on his agility test score.
 
 
 10
 The agility test consists of nine events that simulate the kinds of physical exertions a firefighter might encounter in the course of his duties.[3] The highest score in each of the final seven events goes to the applicant with the fastest time. The remaining scores are adjusted on a "curve," proportionately to the highest score. However, there is no written standard for the scorer to use in making proportionate differentiations between the applicants' scores. Moreover, the department has no procedure by which an individual might contest the score he or she receives.
 
 
 11
 The department forwards the agility test results to the CSC for totaling. An applicant can earn an additional number of points equal to twenty percent of his combined score upon proof of military service. If there is an opening in the fire department, the CSC certifies the names of the top three candidates from the eligibility list for further review, including a personal interview.
 
 C.
 
 12
 The CSC administered both the police and firefighter exams on March 22, 1986. A total of one hundred fifteen persons, fourteen blacks and one hundred one whites, took the police examination. Seven blacks and seventy-six whites passed the test. A total of ninety-six persons took the firefighter exam, ten blacks and eighty-six whites. One black and thirty-eight whites passed the test. Plaintiff Harris, the only black to pass the firefighter written exam, subsequently received the lowest score of all the firefighter applicants who performed the agility test. The CSC thereafter drew up the respective departmental eligibility lists.
 
 
 13
 At the time of the hearing on plaintiffs' motion for a preliminary injunction, the Mansfield police department had eighty-four authorized positions, eighty-two of which were funded. Of these eighty-two positions, seventy-seven were manned, five by blacks and seventy-two by whites. Thus, there were five available police positions. The fire department had ninety-two authorized positions, ninety of which were funded. A total of eighty-seven of these positions were manned by eighty-six whites and one black. Thus, there were three available firefighter positions. Apparently, if all the vacancies in both departments were filled solely from the CSC's March 1986 eligibility lists, no additional blacks would be hired in either department.
 
 
 14
 The City indicated a desire to fill all eight positions as soon as possible by certifying applicants from the respective eligibility lists, pursuant to the prevailing CSC procedures. Plaintiffs request for a preliminary injunction sought to enjoin the City, the police department, and the fire department from certifying any names from the current lists and from appointing any individuals to the police or fire departments.
 
 
 15
 In an extensive written opinion, the district court considered plaintiffs' claims for injunctive relief against the police and fire departments separately. The court reasoned that the rationale for the need each department had for filling its respective positions were separate and unrelated, and that the departments' testing procedures were distinguishable. After separately applying this court's four-factor analysis for determining whether to grant a preliminary injunction, see, e.g., Mason County Medical Ass'n. v. Knebel, 563 F.2d 256, 261 (6th Cir.1977), the court refused to enjoin the police department from continuing to hire officers under the current scheme, but enjoined the City and the fire department from hiring more than three persons from that department's current eligibility list. Plaintiffs and defendants both now appeal the court's order.
 
 III.
 
 16
 Plaintiffs argue on appeal that the district court erred by refusing to enjoin police department hiring from the March 1986 eligibility lists and by incompletely enjoining similar hiring practices by the fire department. Defendants argue that the court abused its discretion by limiting the fire department to filling just three firefighter positions.
 
 
 17
 It is well-settled that district courts evaluating requests for preliminary injunctive relief must consider four interrelated criteria:
 
 
 18
 1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;
 
 
 19
 2) Whether the plaintiffs have shown irreparable injury;
 
 
 20
 3) Whether the issuance of a preliminary injunction would cause substantial harm to others;
 
 
 21
 4) Whether the public interest would be served by issuing a preliminary injunction.
 
 
 22
 Mason County, 563 F.2d at 261. The standard of appellate review of a trial court order granting or denying a preliminary injunction is a determination whether the trial court's decision was an abuse of discretion. Id.; see also Tate v. Frey, 735 F.2d 986, 990 (6th Cir.1984); USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94, 98 (6th Cir.1982).
 
 
 23
 Application of the abuse of discretion standard can be summarized as follows:
 
 
 24
 "In reviewing the decision of a district court to grant or deny a preliminary injunction, this court has continued to invoke the phrase 'abuse of discretion' in articulating the applicable standard." In deciding whether to afford injunctive relief, the district court must first make findings of fact and conclusions of law, and then exercise its discretion to grant or deny the injunction. This court reviews the findings of fact under the clearly erroneous standard; legal conclusions are given de novo review. "[A] factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination.... However, in the absence of such an error the district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases."
 
 
 25
 Baja Contractors, Inc. v. City of Chicago, 830 F.2d 667, 674 (7th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988) (citations omitted). Accord Christian Schmidt Brewing v. G. Heileman Brewing, 753 F.2d 1354, 1356 (6th Cir.), cert. dismissed, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985) (citations omitted): "A district court abuses its discretion when it relies on clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard."
 
 
 26
 Under the Mason County criteria, plaintiffs' initial burden in demonstrating entitlement to preliminary injunctive relief in this case was a showing of "a strong or substantial likelihood or probability of success on the merits" of their class action under 42 U.S.C. Sec. 1981. Mason County, 563 F.2d at 261. To prevail on a Sec. 1981 claim, a plaintiff must prove "intentional discrimination." General Bldg. Contractors v. Pennsylvania, 458 U.S. 375, 383, 102 S.Ct. 3141, 3146, 73 L.Ed.2d 835 (1982). While "[e]vidence of adverse impact of a challenged practice alone is not sufficient to sustain an action under [Sec. 1981], as it could be under title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000 et seq. (1981)[,] ... evidence of an adverse impact might be sufficient to survive summary judgment." Black v. City of Akron, Ohio, 831 F.2d 131, 133 (6th Cir.1987) (emphasis added). However, a plaintiff alleging racial discrimination under Sec. 1981 ultimately must supplement evidence of discriminatory impact with "such circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Such evidence may include: (1) "[d]epartures from the normal procedural sequence ... [suggesting] that improper purposes are playing a role," id. at 267, 97 S.Ct. at 564; (2) "[t]he historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes," id.; and (3) the "administrative history[,] ... especially where there are contemporary statements by members of the decisionmaking body...." Id. at 268, 97 S.Ct. at 565.
 
 
 27
 Once plaintiffs produced substantive evidence of intentional discrimination on their Sec. 1981 claims, the court was required to balance the apparent strength of that evidence against the irreparable harm plaintiffs would suffer in the absence of injunctive relief, the harm which would be caused to others by the issuance of a preliminary injunction, and whether the public interest would be served by an injunction. Mason County, 563 F.2d at 261. We turn now to the evidence introduced in this case.
 
 IV.
 A.
 
 28
 Plaintiffs' motion to enjoin appointments to the Mansfield police department relied heavily upon the testimony of Dr. Douglas Schultz, an expert witness in "tests and measurements." Dr. Schultz testified about several statistical indicators which, in his opinion, show that the department's testing procedures have a "statistically significant impact."
 
 
 29
 Dr. Schultz employed a "chi square" analysis to determine whether the differing pass ratios on the written examination for white and black applicants demonstrated a statistically significant disparate impact on black applicants. A chi-square value is a test of association which measures deviations from expected behavior. Certain deviations are expected to occur as a pattern of chance. However, at some point a discrepancy becomes so large that it is no longer expected to occur as a result of chance alone. The chi-square value for any two series is determined from a standard statistical table. Where a discrepancy becomes larger than that number, it means that the differences have not occurred as a result of chance alone. However, if the chi-square value becomes smaller than that number, the change is probably a result of chance variations. Based on the police department examination pass rate for white applicants of seventy-five percent (seventy-six out of one hundred one applicants) and the pass rate for black applicants of fifty percent (seven out of fourteen applicants), Dr. Schultz determined the applicable chi-square value to be 3.90. He testified that because that number exceeded 3.84, the chi-square value suggested statistical significance warranting the conclusion that the differing examination pass ratios for whites and blacks on the police test were not attributable to chance. The court found that Dr. Schultz's chi-square analysis had demonstrated only a "marginally statistically significant" relationship.
 
 
 30
 Dr. Schultz also testified that the results of the police department's test revealed an adverse impact on blacks under the "four-fifths rule" used by the Equal Employment Opportunity Commission (EEOC). See 29 C.F.R. Sec. 1607.4(D). Under the EEOC's rule:
 
 
 31
 A selection rate for any race ... which is less than four-fifths ( 4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact....
 
 
 32
 The ratio of the black pass rate of fifty percent to the white pass rate of seventy-five percent is sixty-seven percent, less than the eighty percent cutoff used by the EEOC.
 
 
 33
 Plaintiffs also offered evidence of the statistical relationship of past police department hiring practices to race.[4] In 1986, sixteen percent of Mansfield's citizens were black. Of eighty manned police positions, five were filled by blacks. If the percentage of black citizens in the City of Mansfield were reflected in the composition of the police department, there would have been thirteen black policemen. Those figures yielded a standard deviation rate of 3.320.
 
 
 34
 Referring to the concept of the "standard deviation" as a measure of the significance of statistical disparities in a Title VII Civil Rights Act minority school teacher hiring case, the Supreme Court said:
 
 
 35
 "[I]f the difference between the expected value and the observed number is greater than two or three standard deviations," then the hypothesis that [the] teachers were hired without regard to race would be suspect.
 
 
 36
 Hazelwood School Dist. v. United States, 433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 2742 n. 14, 53 L.Ed.2d 768 (1977) (citations omitted). Therefore, applying the Hazelwood guidelines to Mansfield's figures statistically, the number of black policemen on the Mansfield force in 1986 should have been between three (actually 3.04--thirteen minus three standard deviations), and six (actually 6.36--an expected number of thirteen policemen minus two standard deviations). As noted earlier, Mansfield had five blacks on the force. The district court found that the sum of the plaintiffs' statistical evidence "demonstrated a marginally statistically significant disproportionate impact on blacks in the police department when compared to the population of blacks in the City of Mansfield."[5]
 
 
 37
 The plaintiffs argue that the district court "abused its discretion" in concluding that the plaintiffs have shown no more than a "marginally statistically significant disproportionate impact on blacks in the police department." But "abuse of discretion" is not the standard of review for the trial court's factual findings. We are not free to disturb the district court's factual finding of "marginally" disproportionate impact, unless we are able to say that the finding is clearly erroneous. See Baja Contractors, Inc. v. City of Chicago, 830 F.2d at 674. Plaintiffs' chi-square figures do not prove a substantial basis for disregarding the standard deviation figures which have been shown to be within the Supreme Court's acceptable range of chance. Further, this court has been cautious about giving too much weight to "four-fifths" computations where the sample base is of less than significant proportions. See Black v. City of Akron, Ohio, 831 F.2d 131, 134 (6th Cir.1987):
 
 
 38
 Thus, if an employer selects 60% of the blacks and 80% of the whites, this very likely indicates a real difference in selection procedures if he is choosing 600 blacks out of 1,000 and 800 whites out of 1,000. On the other hand, if he chooses 3 blacks out of 5 applicants and 4 whites out of 5 applicants, both common sense and rigorous statistical analysis tell us that it is much more likely that mere chance is the controlling factor. Thus, the small size of the sample might be a reason to rule that there was no prima facie case even if the 4/5 rule were violated....
 
 
 39
 Only fourteen of the one hundred fifteen March 1986 police test applicants were black. The EEOC's rule itself states in part:
 
 
 40
 Greater differences in selection rates may not constitute adverse impact where the differences are based on small numbers and are not statistically significant....
 
 
 41
 29 C.F.R. Sec. 1607.4(D) (emphasis added).
 
 
 42
 In sum, the district court's factual finding cannot be said to be clearly erroneous. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This is especially true given the preliminary nature of the evidence in this case.
 
 
 43
 Plaintiffs also sought to prove discriminatory intent through circumstantial evidence. Most significantly, plaintiffs showed that seven more names appeared on the police eligibility list than the number of applicants who passed the written test, an apparent "[d]eparture from the normal procedural sequence." Village of Arlington Heights, 429 U.S. at 267, 97 S.Ct. at 564. Plaintiffs also introduced testimony that Edward Meehan, Mansfield's Mayor, made a racially derogatory comment to local black leaders that he didn't think blacks were qualified to be policemen in the City of Mansfield. Mayor Meehan denied making the statement. In all events, while it is true that the Mayor ultimately appoints the heads of the police, fire, and civil service departments, according to his own testimony he plays no role in composing or administering the eligibility test, certifying the names from the eligibility list, or interviewing and ultimately appointing individuals from the list. Even if we were to assume that the Mayor made such an ill-conceived statement attributed to him, as the district court noted, the Mayor's alleged "statement is simply not probative of purposeful discrimination in the administration of the test and the certification of the test results."
 
 
 44
 Plaintiffs also showed that Anna Coe, a black member of Mansfield's Human Relations Commission, took both the police and fire department examination. Ms. Coe received a score of eighty-seven out of a possible one hundred on the police examination, but received no extra credit for her education experience. However, as the district court noted, "it was not clear whether Coe's decision to take the two tests was based on her desire to monitor the testing process as a member of the Human Relations Commission, or on a genuine desire to become a member of either the police or fire department." Further, Coe made no attempt to rectify the scoring error after learning that she had not received her extra credit. The district court held that "Coe's testimony is inconclusive at best with respect to establishing circumstantial evidence of discrimination in the hiring of police officers."
 
 
 45
 Weighing plaintiffs' circumstantial evidence together with plaintiffs' "marginally statistically significant evidence" of a discriminatory impact, the district court concluded, under the analysis of Mason County, that plaintiffs had failed to demonstrate a likelihood of success on the merits with respect to the hiring practices employed by the police department. This part of the district court's holding is a legal conclusion subject to de novo review. See Baja Contractors, Inc., 830 F.2d at 674.
 
 
 46
 Plaintiffs argue that the court misapplied the legal standard used to determine whether a claim is sufficiently strong to merit relief in the form of a preliminary injunction. In that regard, this court recently held:
 
 
 47
 [A] stay may be granted with either a high probability of success and some injury or vice versa. However, we reiterate that the demonstration of a mere "possibility" of success on the merits is not sufficient, and renders the test meaningless.
 
 
 48
 State of Ohio ex rel. Celebrezze v. NRC, 812 F.2d 288, 290 (6th Cir.1987) (citations omitted). "[T]he harm alleged should be evaluated in terms of its substantiality, the likelihood of its occurrence, and the proof provided by the movant." Id. at 291 (citation omitted). The court's weighing and balancing of these competing equities is within its discretion and " 'should be disturbed on appeal only in the rarest of cases.' " Baja Contractors, Inc., 830 F.2d at 674 (citation omitted).
 
 
 49
 It is obvious that if plaintiffs are able, eventually, to prevail on the merits of their claim, they will have suffered some actual harm in the absence of injunctive relief. This inevitability alone, however, is insufficient to show that the court below abused its discretion. Since plaintiffs have failed to demonstrate a high probability of success, they must compensate by showing a correspondingly high degree of injury. However, the potential injury they have shown, while conceivably direct and probable, is not likely given their otherwise marginal case. Further, it is undisputed that plaintiffs did not file their motion for injunctive relief until nearly eleven months after they had filed the underlying suit, thus mitigating against the immediacy and irreparability of the injury perceived by plaintiffs. The district court carefully weighed these considerations. We think it did not abuse its discretion in denying preliminary relief.
 
 B.
 
 50
 Ten percent, one out of ten, of the black applicants who wrote the March 1986 firefighter examination passed as did forty-four percent, thirty-eight out of eighty-six, of the white applicants. With respect to the fire department test, Dr. Schultz testified that the chi-square value for the pass rates was 4.34. He concluded that the difference in the pass rates for the blacks and whites was not attributable to chance because a chi-square in excess of 3.84 suggests statistical significance. Under the EEOC's "four-fifth's rule," the ratio between the black pass rate and the white pass rate equals 22.7%, considerably less than the eighty percent standard.
 
 
 51
 In addition to his assessment of the test results, Dr. Schultz analyzed the 1986 racial composition of the fire department as compared to the racial composition of the City of Mansfield. He determined that 1.14%, one out of eighty-seven, of Mansfield firefighters were black, and that according to 1980 census figures, sixteen percent of Mansfield's citizens are black. Therefore, if black employment in the fire department in 1986 had been equal to the percentage of blacks in the City of Mansfield, there would have been fourteen black firemen rather than one. Applying a standard deviation analysis to these figures shows a statistically significant relationship between the representation of blacks in the fire department and their race. An expected number of fourteen firefighters minus three standard deviations results in a minimum expected representation of 3.8 blacks in the fire department. Therefore, since there is only one black firefighter, the defendants' claim that fire department applicants have been selected without regard to race is suspect. See Hazelwood School Dist., 433 U.S. at 308 n. 14, 97 S.Ct. at 2742 n. 14. On the basis of the foregoing evidence, the district court concluded that plaintiffs had shown a statistically significant relationship with respect to race and test results, and with respect to race and representation in the fire department.
 
 
 52
 In their cross-appeal, defendants challenge the court's findings as clearly erroneous. They contend that the department's employment figures are statistically insignificant when they are compared to the state and county population. They argue here, as they did below, that the black population of Richland County and not the City of Mansfield is the relevant criterion for measuring the proportionality of black representation in the Mansfield fire department because Richland County is the "civilian labor force" from which Mansfield hires its firemen. Defendants claim Richland County is 6.1% black. The district court rejected the defendants' argument, noting that 1) ninety-two percent of the black citizens of Richland County live in the City of Mansfield, and 2) in all events, "comparing the representation of blacks in the fire department to any one of the defendants' proposed alternative population groups would also result in a finding of a statistically significant difference in representation."
 
 
 53
 But proof of a disparate racial impact in the composition of the Mansfield fire department alone is insufficient to support a Sec. 1981 claim. Intentional discrimination must be proved. Black v. City of Akron, Ohio, 831 F.2d at 133. To carry that burden, plaintiffs offered, in addition to their statistical data, a variety of circumstantial evidence. First, plaintiffs argued that the CSC's failure to supervise the discretionary agility test developed and administered by the fire department affords the department a substantial opportunity for discrimination. Second, plaintiffs showed that plaintiff Harris, the only black to pass the written test, received the lowest score of all the applicants who performed the agility test. Third, it was shown that three white applicants who did not complete the agility test were inexplicably included on the eligibility list.
 
 
 54
 The district court concluded that the plaintiffs presented sufficient circumstantial evidence to establish a likelihood of success on their Sec. 1981 claim and we are satisfied that conclusion is well-supported by the evidence, given the underrepresentation of blacks in the fire department and the statistically significant race/test score relationship.
 
 
 55
 Plaintiffs asked the district court to enjoin defendants from filling any of the open positions remaining in the fire department. Despite its conclusion that plaintiffs had established a likelihood of success on their underlying claim of intentional discrimination, the court chose not to completely enjoin the fire department from making new appointments. Instead, the court granted injunctive relief restraining defendants from hiring more than three firefighters from its 1986 eligibility list.
 
 
 56
 The court did not deny the possibility that plaintiffs might be irreparably harmed in the absence of greater injunctive relief.[6] But it concluded that the weight of the other criteria that must be evaluated under Mason County --possible substantial harm to others and the effect the requested injunctive relief would have upon the public interest--precluded an injunction barring all fire department hiring. It therefore limited its injunction to "more than three persons from the current eligibility list." Specifically, the court was concerned, based upon the testimony of Fire Chief Kopcial, that failure to fill the vacant firefighter positions posed a potential threat to public safety and to the department itself. The court stated:
 
 
 57
 Chief Kopcial testified that the manning in the fire department currently is the lowest in the history of the fire department. He indicated that the decreased number of fire fighters affects the fire department's ability to provide fire safety services to the city. He indicated that the understaffing decreases the team work and cohesion among individual engine units, because the decreased staffing requires the department to fill available positions by allowing firemen to work overtime and by transferring firemen from one station to another. Chief Kopcial also testified that the decreased staffing results in the manning of positions within units by a person who might not have the requisite experience required to perform adequately on a particular type of equipment. Chief Kopcial testified that these problems are lowering the quality of service by the fire department to the citizens of the City of Mansfield. Thus, the Court finds public interest in not issuing the injunction.
 
 
 58
 and
 
 
 59
 The Court ... finds that the ability of the current City of Mansfield Fire Department to provide protection to the City of Mansfield against fires and other emergencies is severely curtailed by the current understaffing of the fire department. Thus, although the plaintiffs have demonstrated a likelihood of success and irreparable harm, the defendants have shown that ... harm to others and a countervailing of public interest weigh against the issuance of the injunction.
 
 
 60
 Although the district court acted within its discretion in weighing the competing factors underlying its decision to grant plaintiffs' only limited injunctive relief, events subsequent to the trial court's hearing indicate that the court may have given undue weight to factors militating against a broader injunction. Despite its vigorous assertion before the district court that issuance of the requested injunction would seriously jeopardize the public safety and the safety of its firefighters by leaving the fire department understaffed, the defendant City of Mansfield has not, in the eighteen months following entry of the district court's order, filled any of the three vacant firefighter positions despite its ability to do so under the terms of the court's order. This suggests that the defendants may not have fully and completely appraised the district court of the interests which underlie their opposition to plaintiffs' requested injunctive relief. Accordingly, we remand the case to the district court to afford the court an opportunity to reconsider plaintiffs' fire department-related motion in light of the subsequent developments.
 
 V.
 
 61
 For the foregoing reasons, we AFFIRM the district court's order denying plaintiffs' motion to enjoin Mansfield's police department. We AFFIRM the district court's order to partially enjoin Mansfield's fire department and REMAND the case for reconsideration in light of the factors previously discussed.
 
 
 
 [1]
 In addition to the City, plaintiffs named as defendants Edward Meehan, Mayor; Pearl Adams, Personnel Director; William Friend, Service Safety Director; Matthew Benick, Chief of Police; Dyce Kopcial, Fire Chief; and Louise Bush and Terry Kilgore, former chairs of the City's Civil Service Commission
 
 
 [2]
 The court also found, with respect to police department hiring, "that the plaintiffs will not suffer substantial irreparable harm by the issuance of the injunction" and "that there is a strong public interest in ensuring that the police department has adequate manpower to provide protection to the citizens of Mansfield."
 
 
 [3]
 The district court described the agility test as follows:
 The agility test consists of two portions. The first portion consists of two timed events. Each applicant must climb a 50-foot ladder in five minutes, and each applicant must perform a fence and wall climb, during which the applicant runs 45 feet with a rope, tosses the rope over a 5-foot high fence, and then vault the fence. If the applicant successfully completes these two events, the applicant then performs the second portion of the test. The second portion consists of seven additional events. The applicant must perform a ladder lift, charged hose pull, balance beam walk, tower climb, hose lift, and hose stack.
 
 
 [4]
 Even though the statute of limitations may have expired on claims arising out of the department's past hiring decisions, evidence of those decisions is admissible if relevant. See Black Law Enforcement Officers Ass'n. v. City of Akron, Ohio, 824 F.2d 475, 482-83 (6th Cir.1987)
 
 
 [5]
 The district court seemed unimpressed by the defendants insistence that 1) Dr. Schultz's chi-square analysis was incorrect because it did not include a so-called "Yates correction" for chi-square numbers under 5, and 2) the relevant population group for police department applicants was Richland County and not the City of Mansfield
 
 
 [6]
 The court recognized that should plaintiffs eventually prevail, the positions within the department might no longer be available. Further, even if new positions were created in the intervening period, plaintiffs would not have the seniority they might have earned had the injunction been issued. See, e.g., Firefighters Inst. for Racial Equality v. City of St. Louis, 616 F.2d 350, 362 n. 21 (8th Cir.1980), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), where the court held that absent injunctive relief, continued promotions of white candidates based on an unvalidated exam would, as a matter of law, constitute irreparable harm to black candidates whose promotions would be delayed pending a trial on the merits of their claims