81 F.3d 161
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED BLACK FIREFIGHTERS ASSOCIATION, et al., Plaintiffs-Appellants,
v.
The CITY OF AKRON, et al., Defendants-Appellees.
 No. 94-3961.
 United States Court of Appeals, Sixth Circuit.
 March 20, 1996.
 
 Before: MERRITT, Chief Circuit Judge; RYAN, Circuit Judge; and CLELAND, District Judge.*
 MERRITT, Chief Judge.
 
 
 1
 This appeal by the Plaintiffs, United Black Firefighters Association and six individuals who are members of the Association, arises from a grant of summary judgment for the Defendants, the City of Akron, Ohio, George Romanoski, Richard Pamley, Civil Service Commissioners and Donald Plusquellic and Local 330, Akron Firefighters Association. Memorandum Opinion, Case No. 5:90 CV 1678 (Aug. 31, 1994) (Dowd, J.) (unpublished), J.A. at 1015.[1] Plaintiffs allege intentional discrimination against and disparate impact on blacks in the promotional examination given by the City of Akron in June 1990 for the position of fire lieutenant. Specifically, Plaintiffs allege violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, as well as violations of 42 U.S.C. §§ 1981 and 1983. The District Court granted summary judgment for the Defendants. For the reasons set forth in the District Court's very thorough and careful 47-page opinion, we AFFIRM.
 
 
 2
 The facts forming the bases for the claims are not in dispute. In 1988, the City of Akron contracted to develop a promotional examination for the position of Fire Lieutenant. The promotional process has four components: (1) a written job knowledge test (150 multiple choice questions drawn from specific listed testeed) (70% of the examination score); (2) an "assessment center" portion consisting of the applicant's written analysis of a lieutenant's typical "in-basket" followed by an oral presentation (tape recorded and reviewed by three officers from other fire departments, two white and one black) (30% of the examination score); (3) service ratings, a component mandated by an earlier consent decree and consisting of ratings based on both objective and subjective factors, such as number of sick days and number of days tardy, training of other personnel, efficiency and leadership qualities and (4) seniority, a component mandated by Ohio's civil service code. Those candidates who achieve at least a score of 70% on the first two components would have that score weighed at 70% and would have additional points added for service rating (20%) and seniority (10%). Candidates who pass the examination are placed on a list in rank order, the rank representing a combination of the exam score (two parts), a service rating and seniority. Promotions are made in order from this list on an as-needed basis. Plaintiffs challenge components one, two and three as having a disparate impact on blacks.
 
 
 3
 The exam was administered in June and July 1990 and 137 candidates (38 blacks and 99 whites) participated. The final eligibility list was established on August 29, 1990 and expired on August 29, 1992. Based on the results of the first two components of the examination, 118 candidates were placed on the eligibility list (29 blacks and 89 whites). The pass rate for blacks was 76.3% (29 of 38 test-takers), for whites it was 89.9% (89 of 99 test takers). The top 45 candidates (4 blacks and 41 whites) were promoted from this list during the two-year period.
 
 
 4
 The Defendants moved for summary judgment and, after a hearing, the District Court granted the Defendants' motions. The District Court examined very thoroughly all the statistical evidence relating to the pass rate for blacks and whites on the exam, as well as studying each individual component of the promotional process, and found no disparate impact in either the exam as a whole or in any of its individual components. Moreover, the District Court held that, even assuming a disparate impact, Plaintiffs had not met their burden of proving that the exam as given was not content-valid or that an alternative exam existed in 1990 that would eliminate the disparate impact and serve the needs of the employer.
 
 
 5
 Plaintiffs contend on appeal that (1) it was error for the District Court to rely solely on the pass/fail statistic in deciding the issue of disparate impact and that other evidence of disparate impact should be considered, including the clustering of blacks near the bottom of the rank-order list used for actual promotions and the number of blacks actually promoted; (2) a triable issue of fact was raised as to whether alternative tests exist that would not lead to the disparate impact in actual promotions and (3) a triable issue of fact exists regarding whether the Defendants engaged in purposeful discrimination that violated Plaintiffs' constitutional rights. We find no merit in any of these contentions.
 
 
 6
 A review of the entire record demonstrates that the City of Akron put an enormous amount of time and effort into drafting the lieutenant's exam. The City was particularly sensitive to previous complaints about the exam and incorporated certain specific procedures requested by the United Black Firefighters Association, including the rank order listing of eligible candidates. The District Court prepared a very thorough and careful review of all the evidence, looking at both the overall promotional process and the separately challenged components of the exam. Our de novo review of the record reveals that the District Court's conclusion that no genuine issues of material fact exist as to the promotional process is correct.
 
 
 7
 In a rank-order selection process such as the one used here, the higher one's rank on the list, the greater one's chance of being promoted during the lifetime of the eligibility list, here two years. The number of individuals actually promoted from the eligilibilty list varies from year-to-year based on the number of lieutenants needed during the life of the eligibility list. This number is not known in advance and depends on several factors, including the number of lieutenants that retire or are promoted and the size of the force. Under a rank-order selection process where there are more individuals on the eligibility list than are likely needed, those individuals at the bottom of the eligibility list have less chance of promotion than those at the top.
 
 
 8
 Plaintiffs, therefore, contend for the first time in this appeal that under the rank-order selection process the "clustering" of blacks near the low end of the eligibility list constitutes evidence of disparate impact because it results in lower numbers of blacks actually receiving promotions. Defendants argue that Plaintiffs waived this argument by not presenting it to the District Court. We do not decide whether the issue is waived for failure to raise it below. The "clustering" evidence presented by Plaintiffs on appeal, even if considered, would not have any impact on the result of the legal and statistical analysis properly employed by the District Court. Contrary to Plaintiffs' argument, evidence of "clustering" at the lower end of the eligibility list does not create a genuine issue of material fact in a disparate impact case for purposes of deciding a summary judgment motion. The District Court properly looked to the examination pass rate for black candidates, not the number of actual promotions, and found that those numbers do not provide statistical evidence of adverse impact on blacks. Mem.Op. at 19, J.A. at 1033.
 
 
 9
 As to the other issues raised by Plaintiffs on appeal, the record does not contain any evidence that raises a genuine issue of material fact that would preclude summary judgment in this case. Accordingly, the judgment of the District Court is affirmed.
 
 
 10
 CLELAND, District Judge,* concurring.
 
 
 11
 I, too, would affirm. I write separately to express my view that, within the facts of this case, the applicable measure for identifying the possible presence of adverse impact is the final promotion rate of black applicants, not the pass rate by which applicants assumed their rank-ordered places in line for possible promotion. The EEOC guidelines by which we are guided here define "selection rate" as "[t]he proportion of applicants or candidates who are hired, promoted, or otherwise selected." 29 C.F.R. § 1607.16(R).[1] In my opinion, it would strain the language of the regulation to conclude that those who are merely determined eligible for promotion--but are not in fact promoted--are among the "selected."
 
 
 12
 The district court's decision to the contrary relied on Black v. City of Akron, 831 F.2d 131 (6th Cir.1987). Black, however, is distinguishable from the case at bar because the test administered in Black was pass/fail. A candidate who passed with an excellent score was in no better position, job-wise, than another with the lowest score who nonetheless passed. The test in the case at bar resulted in a rank-ordered list, from which candidates were chosen in descending order of score. Those with higher scores had a higher chance of being promoted, while candidates at the bottom of the list were really no better off than those who failed to make the cut: neither could reasonably expect to be promoted.
 
 
 13
 This distinction is important because where the minority candidates' scores tend to cluster lower than those of whites, an employer, if motivated to manipulate, could simply adjust the pass rate to meet the EEOC's four-fifths rule while still ensuring that minority candidates would not be promoted.[2] Designating a low "passing" score could ensure more minorities would "pass," even though their chances of being promoted might approach zero. Taken to the extreme, with a very low score arranged to be "passing," the demographics of the pass rate would do no more than mirror the demographics of the applications. Thus, under the majority's rule, a clever employer could--with the clustering effect present here--ensure that the "selection rate" would be 100%.
 
 
 14
 Also, I am unpersuaded by Local 330's argument that the number of candidates promoted is "fortuitous and uncontrollable." Local 330 Brief at 21. In the settlement that was previously vacated by this court, the City arranged to promote 59 candidates even though only 45 were "needed." Furthermore, a modern municipality can reasonably be expected to predict with fair accuracy--if not to "control"--the number of positions likely to fall vacant based on its history of retirements, current retirement inducements, the ages of current employees, the history of promotions following in the wake of retirements, and other data concerning separations from employment.
 
 
 15
 More importantly, the four-fifths rule is only the first step in determining whether the plaintiffs have met their burden of persuasion. Failing the four-fifths test does not necessarily mean that a defendant will be found liable, or even that the defendant will be denied summary judgment. If the employer can show that the test has "a manifest relationship to the employment in question," the employer will not be found liable unless the plaintiffs can show that "other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' " Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). It is not "absurd," as Local 330 argues, to ask whether the foundational test serves a legitimate purpose where the promotion rate of blacks is less than 80% of the promotion rate for whites. But, if a marked discrepancy in promotion rate is simply the result of differences in ability among individual candidates, the defendants would not be liable.
 
 
 16
 Title VII seeks to ensure a race-neutral process, not a racially-balanced result. The evaluation of the process, however, must be based on the objective, verifiable analytical steps prescribed by the Supreme Court, and in my opinion the steps prescribed in Ward's Cove Packing Co., Inc. v. Antonio, 490 U.S. 642 (1989) are to be taken rather mechanistically. We should resist a temptation to consider additional factors (e.g., the "painstaking steps" toward fairness attributed to defendants herein) which might, at first blush, seem significant but which are actually subject to orchestration by prospective defendants. A court allowing itself to be moved by such factors undermines the Supreme Court's prescribed mode of analysis.
 
 
 17
 I would hole that the record supports the district court's findings, 1) that the defendants showed a business justification for using the tests in question and, 2) that the plaintiffs failed to show that other tests or selection devices without a similarly undesirable racial effect would have also served the defendants' legitimate goals. For those reasons, I concur.
 
 
 
 *
 The Honorable Robert H. Cleland, District Judge, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 References to the Joint Appendix filed in this appeal will be cited" J.A. at ___."
 
 
 *
 The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 A selection rate for blacks of less than 80% the selection rate for whites is evidence of adverse impact. See 29 C.F.R. § 1607.4(D)
 
 
 [2]
 I would find that the "clustering" effect may properly be considered by this court, despite the defendants' contention that it constitutes an issue waived by plaintiffs' failing to raise it below. "Clustering" is not really a separate "issue" at all; it is merely something about these test results which can be discerned by observation. The rank-ordered list was submitted by the City of Akron as an attachment to its motion for summary judgment, Joint Appendix ("JA") at 440, and the court appended the list to its order granting the defendants' motions. JA at 1062. A cursory inspection of the list reveals that the first twenty people on the list bear the race code "W" and that only two of the first forty individuals has the race code "B." The clustering effect was readily apparent to any party who looked at the test results