12 F.3d 211
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Nida ANDERSON, Plaintiff-Appellee,
v.
Don KELLEY, Secretary, Commonwealth of Kentucky,
Transportation Cabinet; Norris Beckley, Commissioner,
Kentucky Department of Transportation; Steve Anders; and
Commonwealth of Kentucky, Transportation Cabinet,
Defendants-Appellants.
 No. 92-6663.
 United States Court of Appeals, Sixth Circuit.
 Dec. 15, 1993.
 
 On Appeal from the United States District Court for the Eastern District of Kentucky, No. 92-00413; Wilhoit, J.
 E.D.Ky.
 REVERSED.
 Before: KENNEDY, MILBURN, and GUY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendants appeal the district court's grant of a preliminary injunction requiring them to reinstate plaintiff to her former position and enjoining any retaliation against her for bringing this action. On appeal, the issues are (1) whether the district court erred by granting injunctive relief in the absence of a request for Title VII relief by plaintiff Anderson, and (2) whether the district court abused its discretion by issuing a preliminary injunction against defendant transportation cabinet. For the reasons that follow, we reverse.
 
 I.
 
 2
 Plaintiff Nida Anderson filed a complaint in this action on October 14, 1992, alleging that she was sexually harassed during the course of her employment and fired in retaliation for reporting the alleged harassment. In her original complaint, plaintiff sought damages, back pay, and reinstatement under Title VII, 42 U.S.C. Sec. 2000e et seq., and Kentucky's Whistleblower Statute, K.R.S. Sec. 61.102. On the same day plaintiff filed her complaint, she also filed a motion for injunctive relief under the state whistle-blower statute.
 
 
 3
 A hearing on the motion for a preliminary injunction was held on October 22, 1992. On the day of the hearing, defendants filed a motion for a more definite statement of the grounds for federal jurisdiction in the case, which was denied. The hearing on the injunction revealed that Anderson began her employment with the Kentucky Transportation Cabinet in February 1991 as a nonmerit principal assistant, a political appointment. Anderson held this position until January 16, 1992, when she tendered her resignation and was demoted to the position of non-merit executive secretary senior. Beginning January 16, 1992, Anderson served as an executive secretary in the Commissioner's Office for the Department of Vehicle Regulation. As a non-merit employee, Anderson was not entitled to the protection of the personnel merit system set forth in K.R.S. Sec. 18A. Rather, she served solely at the pleasure of the Transportation Cabinet and was subject to termination at any time. From the time of her reassignment in January 1992, the Commissioner of the Department of Vehicle Regulation supervised Anderson's work.
 
 
 4
 Plaintiff Anderson alleged that defendant Anders sexually harassed her during an extended trip which was taken by Anderson and Anders from January 29, 1992, to February 4, 1992. During this extended trip, Anderson and Anders travelled to Lake Tahoe, Nevada; Reno, Nevada; and Scottsdale (Phoenix), Arizona. The Kentucky Transportation Cabinet did not approve the trip in advance.
 
 
 5
 At the time that the alleged sexual harassment occurred, Anderson was temporarily assigned to a project involving the Commercial Vehicle Safety Association or Alliance ("CVSA") and was working with Steve Anders to select a convention site for the CVSA. CVSA is a national association in which the Kentucky Transportation Cabinet was an active participant, and during the period at issue, defendant Anders was president of the CVSA.
 
 
 6
 During the hearing on the preliminary injunction, plaintiff Anderson testified concerning Anders' alleged harassment of her. Anderson testified that Anders drank excessively during the trip; asked her to share his bed while they were in Lake Tahoe; told her she looked beautiful and put his arm around her chair while they were in Reno; told her he wanted to sleep with her when they were in Scottsdale, Arizona; and put his arm through the bathroom door of their shared suite in Scottsdale, Arizona, while she was taking a shower. Additionally, Anderson claims that at one point she walked into Anders' bedroom in their shared suite and that he was naked and jumped at her.
 
 
 7
 After returning to the offices of the Transportation Cabinet on February 5, 1992, Anderson reported Anders' actions to his supervisor, Colonel John Robey, the Director of Motor Vehicle Enforcement. An investigation into the alleged incidents was then commenced by the Transportation Cabinet. After reporting the incident, Anderson was returned to the office of the Commissioner of the Department of Vehicle Regulation. This transfer ended Anderson's involvement in the CVSA project but was not a demotion.
 
 
 8
 On June 25, 1992, Anderson's employment was terminated by the Transportation Cabinet. Norris Beckley, the Commissioner of the Department of Vehicle Regulation, recommended Anderson's dismissal because she could not type competently. Beckley asserted that he had no knowledge of the allegations of sexual harassment. Anderson also admitted that she was very bad at typing.
 
 
 9
 Plaintiff filed an amended complaint on November 3, 1992. In her amended complaint, plaintiff added civil rights claims under 42 U.S.C. Sec. 1983 and the Kentucky Civil Rights Act, K.R.S. Sec. 344.040, to her claims of sexual harassment and retaliatory discharge under Title VII and the Kentucky whistle-blower statute.
 
 
 10
 On November 13, 1992, the district court entered a memorandum opinion and order granting plaintiff's motion for a preliminary injunction based upon the standards of In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir.1985). Under the terms of the preliminary injunction, defendants were ordered to reinstate plaintiff to her former position pending the ultimate outcome of the action, and they were further enjoined from taking any action against plaintiff in retaliation for the filing of this action. This timely appeal followed.[1]
 
 II.
 A.
 
 11
 Defendants argue that the district court erred in granting injunctive relief in this case in the absence of a request for Title VII relief by Anderson. Specifically, defendants assert that the district court abused its discretion by finding that plaintiff's pendent state whistle-blower claim was timely under K.R.S. Sec. 61.102 and by including K.R.S. Sec. 61.102(1) as the basis for granting a preliminary injunction.
 
 
 12
 Following her discharge on June 25, 1992, plaintiff Anderson filed a complaint with the EEOC on or about July 21, 1992. She received a right-to-sue letter from the EEOC on September 15, 1992. Plaintiff filed her original complaint in this case on October 14, 1992. The original complaint refers to Title VII, 42 U.S.C. Sec. 2000(e), in the body of the complaint, J.A. 6, but not in the prayer for relief. As earlier stated, plaintiff filed her motion for a preliminary injunction on the same day she filed her original complaint. In relevant part, the motion states:
 
 
 13
 Comes now the plaintiff, by and through counsel, and respectfully requests this Court to set this Motion for a preliminary injunctive hearing pursuant to [Federal Rule of Civil Procedure] 65 on the plaintiff's state Whistleblower claim. KRS 61.102.
 
 
 14
 J.A. 15. The motion for injunctive relief makes no reference to Title VII. However, as earlier stated, the amended complaint specifically adds claims for violations of 42 U.S.C. Sec. 2000e (Title VII) to the prayer for relief.
 
 
 15
 Essentially, defendants are arguing that the district court lacked subject matter jurisdiction over the motion for the preliminary injunction because the motion was based upon an untimely pendent state law claim under the Kentucky whistle-blower statute, K.R.S. Sec. 61.102. In its order, the district court stated that "the Court recognizes subject matter jurisdiction over this action. Plaintiff has properly raised claims under Title VII and Sec. 1983 along with several pendent state law claims. The granting of a preliminary injunction pursuant to such claims is within the discretion of this Court." J.A. 19-20 (footnote omitted). The district court also commented that "a review of the appropriate state statutes do not convince this Court that any of the pendent state law claims are time-barred." J.A. 20.
 
 
 16
 K.R.S. Sec. 61.103 authorizes a civil action for violations of the whistle-blower statute by stating that "employees alleging a violation of KRS 61.102(1) may bring a civil action for appropriate injunctive relief or punitive damages, or both, within ninety (90) days after the occurrence of the alleged violation." Ky.Rev.Stat.Ann. Sec. 61.103 (Michie/Bobbs-Merrill 1986). Plaintiff's original complaint was filed on October 14, 1992, more than 90 days after her discharge on June 25, 1992. Further, plaintiff received her right-to-sue letter on September 15, 1992, within 90 days of her discharge. Thus, plaintiff could have brought her Title VII action and her pendent state claim under Sec. 61.102(1) within ninety days of her discharge. Therefore, the district court erred in concluding that plaintiff's action under K.R.S. Sec. 61.102(1) was not time barred and also erred in including Sec. 61.102(1) as one of the grounds for the issuance of its preliminary injunction.
 
 
 17
 However, a reading of the district court's order clearly shows that the district court did not base its grant of a preliminary injunction solely on K.R.S. Sec. 61.102(1). The district court relied on Title VII and Sec. 1983 as well. Moreover, even though plaintiff's claims under K.R.S. Sec. 61.102(1) were time barred, the district court had the authority to determine whether it had subject matter jurisdiction as to the motion for injunctive relief. It is well established that a court has authority to determine whether it has subject matter jurisdiction. United States v. United Mine Workers of America, 330 U.S. 258, 291-92, 67 S.Ct. 677, 695 (1947).
 
 
 18
 Furthermore, the district court had the authority under Title VII to issue a preliminary injunction ordering plaintiff's reinstatement.[2] In Sheehan v. Purolator Courier Corp., 676 F.2d 877 (2d Cir.1981), the court stated:
 
 
 19
 [T]he [Supreme] Court has held that when the jurisdiction of a court of equity has been invoked, the court may, unless there is a clear statutory restriction, exercise its equity powers to the fullest. Accordingly, in a Title VII case where a right to sue letter has been obtained, a preliminary injunction has been held available, notwithstanding Congress's silence as to such relief.
 
 
 20
 Id. at 884-85 n. 11 (citing Culpepper v. Reynolds Metals Co., 421 F.2d 888 (5th Cir.1970) (internal citations omitted). See also Ekanem v. Health & Hosp. Corp. of Marion County, 589 F.2d 316 (7th Cir.1978) (per curiam) (plaintiff who had received right-to-sue letter in a Title VII action could succeed in obtaining preliminary injunction ordering reinstatement if the four-factor test for a preliminary injunction were satisfied).
 
 
 21
 In this case, Anderson's motion for a preliminary injunction was filed at the same time as her original complaint, and the two were meant to be construed together. Further, the original complaint mentioned Title VII relief. Therefore, the district court had subject matter jurisdiction over the motion for a preliminary injunction and had the authority to issue the injunction pursuant to Title VII.
 
 B.
 
 22
 Defendants argue that the district court abused its discretion by concluding that Anderson had satisfied the four-factor test for the issuance of a preliminary injunction. Specifically, defendants assert that the district court erred in finding that Anderson was irreparably harmed or suffered a real threat of irreparable injury, that the district court erred by concluding that Anderson demonstrated a likelihood of success on the merits of her claim, and that the district court erred in concluding that the public interest in protecting citizens from sexual harassment and retaliatory discharge favored the granting of a preliminary injunction.
 
 
 23
 A district court's decision to grant a motion for a preliminary injunction is reviewed for an abuse of discretion. In re Eagle-Picher Indus., Inc., 963 F.2d 855, 858 (6th Cir.1992); Gaston Drugs, Inc. v. Metropolitan Life Ins. Co., 823 F.2d 984, 988 (6th Cir.1987). A district court's findings of fact underlying its decision to grant a preliminary injunction are reviewed for clear error, and the legal conclusions underpinning its decision are reviewed de novo. Eagle-Picher, 963 F.2d at 858 (citing N.A.A.C.P. v. City of Mansfield, Ohio, 866 F.2d 162, 166 (6th Cir.1989)). A legal or factual error may be sufficient to determine that the district court abused its discretion, but "absent such an error, the district court's weighing and balancing of the equities is overruled 'only in the rarest of cases.' " Id. at 857 (quoting N.A.A.C.P., 866 F.2d at 166).
 
 
 24
 There are four factors which are of particular importance in determine whether a preliminary injunction is proper: "(1) the likelihood of plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction [would] harm others; and (4) whether the public interest would be served by the injunction." Southern Milk Sales, Inc. v. Martin, 924 F.2d 98, 103 n. 3 (6th Cir.1991); In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir.1985). A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue. Id.
 
 
 25
 "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981). Therefore, the findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at trial on the merits. Id. In light of such considerations, it is generally considered inappropriate for a federal court to make a final judgment on the merits at the preliminary injunction stage. Id.
 
 
 26
 Furthermore, the four factors which are applicable to a preliminary injunction are "factors to be balanced, not prerequisites that must be met." DeLorean, 755 F.2d at 1229. No single factor will be determinative as to the appropriateness of equitable relief. Id. Hence, "[a] finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at a minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.' " Gaston Drugs, 823 F.2d at 988 n. 2 (quoting Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir.1982)).
 
 
 27
 Defendants argue that the district court erred when it found that plaintiff Anderson had been irreparably injured or was faced with a real threat of irreparable injury. Specifically, defendants assert that the potential financial losses suffered by Anderson due to the loss of her employment are not enough to constitute irreparable injury.
 
 
 28
 In order to obtain a preliminary injunction, the harm that would result in the absence of the injunction must be irreparable, not merely substantial. Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937 (1974). At the preliminary hearing, Anderson's counsel summarized the facts which support a finding of irreparable harm. He stated that Anderson was a month behind on the mortgage payment on her house, has two small children living with her at home, has no health care coverage, and has medical needs which are not being currently met due to her inability to pay for treatment; namely, Anderson is severely anemic and requires a specialized type of medication. Anderson's counsel also stated that she was receiving psychological treatment for the alleged sexual harassment and has been unable to continue with her treatment. Tr. 6, 7.[3]
 
 
 29
 Anderson testified at the hearing on the preliminary injunction, described her situation, and stated that her only income was from child support and unemployment compensation. She also testified that she filed a worker's compensation claim with the Transportation Cabinet, asserting that she is suffering from acute post-traumatic stress disorder but that she had not yet received the results of that claim. Anderson testified that she is anemic and that she has to go to the emergency room for an eight-hour period to have iron put into her veins. She further testified that with no income she is unable to afford the treatment and that she has no health care coverage now that she is unemployed.
 
 
 30
 Anderson also testified that she is behind on her mortgage and car payments. However, Anderson further admitted that when she left the Transportation Cabinet she was advised that she could purchase extended health benefits under COBRA, the Consolidated Omnibus Reconciliation Act of 1985.[4]
 
 
 31
 Nonetheless, no evidence of the amount of plaintiff's income appears in the record. Anderson admitted receiving child support payments and unemployment benefits; however, she presented no evidence as to the amount of such benefits. Thus, it is impossible to determine from the record whether or not she can afford to purchase extended health benefits under COBRA. Moreover, plaintiff has not shown that she is unable to obtain other employment.
 
 
 32
 Further, "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." Sampson, 415 U.S. at 90, 94 S.Ct. at 952-53. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Id. (quoting Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (1958)). In Sampson, the Court further stated:
 
 
 33
 We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment--external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself--will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation.
 
 
 34
 Id. at 91 n. 68, 94 S.Ct. at 953 n. 68. See also Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402 (1987) ("In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies."). Thus, in E.E.O.C. v. Anchor Hocking Corp., 666 F.2d 1037, 1044 (6th Cir.1981), this court affirmed the district court's denial of a preliminary injunction in a Title VII action stating
 
 
 35
 With regard to [the plaintiff], we agree with the district court that the statutory remedies of reinstatement and back pay will adequately redress his injury if his retaliation claim is successful.
 
 
 36
 In this case, defendants are correct in stating that the fact that plaintiff is in arrears on her mortgage and car payments will not support a finding of irreparable injury, since those injuries can be made whole by damages if plaintiff is successful in her action against defendants. However, the district court also heard other evidence; namely, that plaintiff suffers from an apparently severe case of anemia requiring costly treatment which plaintiff is unable to afford without medical insurance or income. In Leonhardt v. Holden Business Forms Co., 828 F.Supp. 657, 664 (D.Minn.1993), the plaintiff had cancer and required an autologous bone marrow transplantation (ABMT) or else the cancer would progress and take her life. The district court found irreparable harm if plaintiff were to be denied medical coverage for the ABMT treatment. Likewise in Kekis v. Blue Cross and Blue Shield of Utica-Watertown, Inc., 815 F.Supp. 571, 584 (N.D.N.Y.1993), the plaintiff had breast cancer and needed AMBT treatment. The district court stated that the court was convinced that the AMBT treatment would have some medical value to the plaintiff and that plaintiff would be deprived of valuable medical treatment if she were denied injunctive relief. The district court stated that "inasmuch as this deprivation would permanently affect her health (although the extent of this effect is unknown), it is not the type of deprivation that could be compensated with monetary relief in the future." Id.
 
 
 37
 In this case, plaintiff requires treatment for her anemia. However, because the record does not show whether or not plaintiff can afford to purchase extended health care benefits under COBRA, it is not clear from the record that plaintiff would be unable to afford and obtain treatment for her anemia absent injunctive relief. Therefore, plaintiff has failed to establish that in the absence of injunctive relief, she may suffer the type of deprivation or injury to her health that could not be compensated with monetary relief in the future. Thus, the district court committed clear error when it concluded that plaintiff may suffer irreparable harm in the absence of injunctive relief.
 
 
 38
 In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success. Mason County Medical Ass'n v. Knebel, 563 F.2d 256, 261 n. 4 (6th Cir.1977). However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation. DeLorean, 755 F.2d at 1229. Furthermore, because granting a preliminary injunction " '[is] in no sense a final disposition,' " this court will refrain from comprehensively reviewing the merits beyond the point which is minimally necessary " 'to determine if the trial court exceeded reasonable discretion in rendering preliminary relief.' " Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati, 822 F.2d 1390 (6th Cir.1987) (quoting Tate v. Frey, 735 F.2d 986, 990 (6th Cir.1984)).
 
 
 39
 In this case, the proof presented at the preliminary injunction hearing demonstrates that the district court erred when it concluded that plaintiff had established a likelihood of success on the merits. The evidence showed that during her trip with Anders to select a site for the CVSA national convention, Anders made several sexual overtures to Anderson. Anderson testified that Anders made the reservations for the rooms at each of the three cities in which they stayed. Each of these rooms was generally described as a suite with two bedrooms and a living room in between, although the layout of the suite in Arizona was apparently much more elaborate. Anderson testified that when she and Anders arrived at Lake Tahoe, their room was a lakefront cottage and that when she asked Anders which bedroom he wanted he replied, "Well, I would consider it an honor if you would share my bed." Tr. 93-94. Anderson also testified that when they arrived in Phoenix, Anders told her that he sensed "a lot of tension between" them and that when she replied that there was, he told her that all he wanted to do was sleep with her. Tr. 102. When Anderson told Anders "no," he replied, "[y]ou don't have to have sex with me. Just let me hold you." Tr. 103. After that conversation, Anders told Anderson that he was an alcoholic and had been hospitalized for alcoholism.
 
 
 40
 Anderson testified that she then returned to her bedroom and locked the door, but that she had opened the patio door and forgot to check to see if the screen door was locked. She stated that she took a shower and that while she was standing in the shower, she saw the doorknob turning and said, "don't come in here." Anderson testified that when she saw Anders' arm come into the room, she screamed and then Anders hesitated and shut the door. Tr. 104.
 
 
 41
 According to Anderson, after making sure Anders was not in her bedroom, she got dressed and went to dinner. As she left to go to dinner, Anders told her he was "commode hugging drunk." Tr. 106. Anderson testified that when she returned to the room after dinner, she went to the doorway of Anders' bedroom to see if he was ill and that he jumped out from his bedroom "strip stark naked." When she told him to put some clothes on, he gave her a crazy grin like the "Joker" on the television program Batman. Tr. 107. Anderson also testified that on the flight back to Kentucky, Anders told her that no one needed to be told about the events on the trip but that she told Anders it was too late.
 
 
 42
 When Anders and Anderson returned to the offices of the Transportation Cabinet on February 5, 1992, Anderson told Colonel John D. Robey about the events which transpired on the trip. Robey was the director of the Division of Motor Vehicle Enforcement for the Transportation Cabinet. He was Anders' supervisor, and plaintiff Anderson was working in his department while she was temporarily assigned to assist Anders with the CVSA project. Colonel Robey also spoke with Anders about the events of the trip. Robey testified that Anders told him that he had frightened Anderson while they were on the trip, and he admitted that most of what Anderson had said was true, including the fact that he stuck his arm through the doorway of her bathroom while she was taking a shower. Colonel Robey testified that Anders asked him if he should resign and that Robey told him "no" but that the incident would be on the record. Anders indicated to Robey that he wanted to be able to serve out the rest of his year as the president of the CVSA.
 
 
 43
 Robey testified that after he talked with Anders he informed his superior, Lewis Dotson, the Commissioner of Vehicle Regulation, about what he had been told by Anders and Anderson. The following day, February 6, 1992, Robey was told to tell Anderson to report to Commissioner Dotson's office since she was being assigned there for work. Robey testified that at that point in time he thought that the situation was unusual because the victim was being reassigned, and he thought that Anders should have been the person to be reassigned.
 
 
 44
 Colonel Robey also testified that he was present on February 6, 1992, when plaintiff Anderson related her version of the events to Ms. Betty C. Hawkins, personnel director for the Transportation Cabinet. Colonel Robey testified that Hawkins seemed to take the situation "kind of lightly" and even "laughed at one point." Tr. 28. Robey testified that after Anderson left, he had a conversation with Ms. Hawkins and that Hawkins told him that on a previous occasion, Anders had been sent out into the field by a former director of the Transportation Cabinet to do an investigation on a female employee and had ended up sleeping with the employee. Hawkins told Robey that nothing had ever been done about the previous situation, and she "expressed surprise that the former director didn't take any action." Tr. 29. Colonel Robey testified that subsequently he had another conversation with Hawkins and another individual and was told to stay out of the situation.
 
 
 45
 Betty Hawkins also testified at the hearing. She admitted that during the investigation, Anders told her that he had a drinking problem and had previously been hospitalized for alcoholism. Hawkins testified that she learned about the situation involving Anders and Anderson on February 6, 1992, when Anderson told Hawkins her version of the events in the presence of Colonel Robey. Hawkins also admitted that Colonel Robey told her that Anders had admitted to him that he acted improperly on the trip. Hawkins also testified that Anders told her his version of the events and that he admitted that some of what Anderson had said was true. Hawkins testified that her reaction to Anderson's story was that Anderson was "asking for trouble" and that she had placed herself in that kind of position. Tr. 60. Hawkins stated that Anders told her that he had a prior sexual relationship with Anderson including sexual relations in the fall of 1991. Anderson testified, however, that she did not have a sexual relationship with Anders.
 
 
 46
 Hawkins testified that after her investigation ended, she concluded that "Mr. Anders had not sexually harassed Ms. Anderson. He had acted inappropriately on his part as a Cabinet manager but that there was not sexual harassment. They were working together on a project. He was not her supervisor, so there were no ... promises of job security for sexual favors or anything of that nature." Tr. 64. However, Hawkins also admitted that Anders and Anderson were a team working on the CVSA project and while Anderson was assigned to the CVSA project, her day-to-day responsibilities involved working for Anders.
 
 
 47
 Hawkins testified that as a result of her investigation, Anders was reprimanded for taking a trip without proper authorization and that he was asked to take annual leave time for the time away from work. Anders was not reprimanded for sexual harassment, and the Cabinet plans to take no action against Anders.
 
 
 48
 Hawkins further testified that Commissioner Norris Beckley recommended that Anderson be discharged because she was performing her duties unsatisfactorily. Commissioner Beckley indicated to Hawkins that he had given Anderson typing to do and that there were numerous errors.
 
 
 49
 Commissioner Norris Beckley also testified that he recommended that Anderson be fired because he was not satisfied with her job performance. He testified that she was unable to fill the position of executive secretary because he had given her typing on several occasions and the work which she performed was not proficient and had several mistakes. In this regard, Anderson testified that when she was relocated after reporting the incidents with Anders, she expressed her concern to Betty Hawkins by telling her that even though her job title had been executive secretary, she was not a secretary and had not typed in years. She stated that Hawkins told her "[t]hat is no problem" and that she would be "working on projects ... just like you have been." Tr. 125. Anderson also admitted that her typing was "very bad ... very rusty." Tr. 125.
 
 
 50
 Darrell Baker, the executive staff advisor in the department of personnel, testified that he was asked to investigate Anderson's claim of sexual harassment. He also concluded that no sexual harassment occurred because he was not convinced that Anders had supervisory authority or the power to make decisions concerning Anderson's employment. According to Baker, Anders agreed with the information provided by Anderson about the incidents although he disagreed with her conclusions about the severity of the incidents. Baker testified tghat Anders denied appearing in the nude before Anderson. Baker testified that he concluded that Anders did not appear in the nude. According to Baker, he reached this conclusion even though Anders had indicated to him that at the time of the alleged nudity, he had consumed enough alcohol to the point that he was "commode hugging drunk" and may not have remembered clearly.
 
 
 51
 Defendants assert that Anders' actions were not quid pro quo sexual harassment because Anders was not Anderson's supervisor and did not condition Anderson's job or other economic benefits upon accepting or denying his advances. Quid pro quo sexual harassment consists of an employer's "sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments." Highlander v. K.F.C. Nat'l Management Co., 805 F.2d 644, 648 (6th Cir.1986). To prevail on a claim of quid pro quo sexual harassment, a plaintiff has the burden of proof to support charges that submission to the unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that tangible job detriment resulted from the employee's failure to submit to the sexual demands of supervisory personnel. Id. Anderson did not offer any evidence that submitting to Anders' sexual advances was a condition for receiving job benefits, a promotion, or even continued employment. Thus, she has failed to show a substantial likelihood of success on the merits of a claim for quid pro quo sexual harassment.
 
 
 52
 "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' " Harris v. Forklift Systems, Inc.,[5] No. 92-1168, 1993 WL 453611 at * 3 (U.S. November 9, 1993) (quoting 42 U.S.C. Sec. 2000e-2(a)(1)). "Such language evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment which includes requiring people to work in a discriminatorily hostile or abusive environment." Id. (quoting Los Angeles Dep't of Water and Power v. Manhart, 435 U.S. 702, 707 n. 13 (1978)). A violation of Title VII occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Id. (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview.' Id. However, "Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or help them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." Harris, 1993 WL 453611 at * 3. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id., 1993 WL 453611 at * 4. "The effect on the employee's psychological well being is ... relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." Id.
 
 
 53
 In alleging a sexually hostile environment, a plaintiff must cite more than simply a single or isolated incident. Rabidue v. Osceola Ref., 805 F.2d 611, 620 (6th Cir.1986), cert. denied, 481 U.S. 1041 (1987). Further, to establish a claim of sexual harassment based upon a hostile work environment, a Title VII plaintiff must establish liability on the part of defendants based upon traditional agency principles. See Kauffman v. Allied Signal, Inc., Autolite Div., 970 F.2d 178, 183-84 (6th Cir.), cert. denied, 113 S.Ct. 831 (1992).
 
 
 54
 In this case, plaintiff Anderson was clearly subjected to unwanted requests for favors and other advances of a sexual nature. The offensiveness of the conduct is gauged under an objective standard; namely, how a hypothetical reasonable person would react to the advances, not how the particular plaintiff reacted. Harris, 1993 WL 453611 at * 3; Rabidue, 805 F.2d at 611. Here, the incidents which occurred on Anders' and Anderson's trip clearly would have offended a reasonable person.
 
 
 55
 Moreover, plaintiff has not alleged a single, isolated incident. Although the incidents occurred during an extended trip, plaintiff has identified four separate events which occurred during the trip with Anders. Further, without citing any authority, defendants argue that this case does not involve a hostile work environment because these incidents occurred away from the Transportation Cabinet workplace. However, the evidence presented at the hearing on the motion for a preliminary injunction clearly showed that Anderson traveled on the trip with Anders as part of her assigned duties to assist in site selection for the CVSA national convention.
 
 
 56
 Moreover, Anderson presented evidence that Anders' unwelcome sexual advances affected her psychological well-being. She testified that prior to her discharge she was receiving psychological therapy due to Anders' advances.
 
 
 57
 As also noted previously, a hostile work environment claim involves respondent superior. According to these principles, "liability exists where the ... defendant knew or should have known of the harassment and failed to take prompt remedial action." Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir.1989). See also Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 577 n. 4 (10th Cir.1990) (quoting 29 C.F.R. Sec. 1604.11(d) (1989):
 
 
 58
 [W]ith respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.
 
 
 59
 In this case, immediately after plaintiff reported the incidents with Anders, defendants physically relocated her in the Transportation Cabinet premises. This reassignment was to her regular position. Apparently, this ended the incidents of sexual harassment by Anders since there is no evidence in the record, at least in this stage of the proceedings, that Anders made any further unwanted sexual advances towards Anderson. In view of this prompt corrective action and the fact that the harassment occurred on an isolated trip, Anderson has failed to show a substantial likelihood of success on the merits of a claim of a hostile work environment.
 
 
 60
 Anderson has also asserted a claim of retaliatory discharge under Title VII. Title VII expressly proscribes retaliation against anyone who "has opposed any practice made an unlawful employment practice" by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the statutory scheme. See 42 U.S.C. Sec. 2000e-3(a).
 
 
 61
 The elements of a prima facie case of retaliation are (1) that a plaintiff engaged in an activity protected by Title VII; (2) that the exercise of her protected rights was known to defendants; (3) that defendants thereafter took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir.1987); Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir.) (per curiam), cert. denied, 498 U.S. 984 (1990).
 
 
 62
 In this case, plaintiff has not established a likelihood of success on the merits on her claim of retaliatory discharge. After reporting Anders' actions on the trip, Anderson's duties were immediately changed. However, Anderson's job title through the entire period covered by this case was executive secretary, and the evidence presented at the hearing on the motion for a preliminary injunction showed that up until that time, plaintiff had never performed the duties of an executive secretary but, rather, had performed special projects. Moreover, when plaintiff was told that her duties were being changed, she expressed doubts about her ability to perform the duties of an executive secretary because she had not typed for so long.
 
 
 63
 Further, plaintiff cannot prevail on her claim of retaliatory discharge because she was not terminated until June 1992, slightly more than four months after she complained about Anders' action. In Cooper v. City of North Olmstead, 795 F.2d 1265, 1272 (6th Cir.1986), this court held "[t]he mere fact that [plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation." In this instance, the record established a legitimate nondiscriminatory reason for plaintiff's termination; namely, her poor typing ability, a fact which plaintiff herself admitted. Further, there is no evidence that Commissioner Norris Beckley, who replaced Commissioner Lewis Dotson several months after the incidents between Anderson and Anders, was aware of the alleged sexual harassment at the time he recommended Anderson's termination.
 
 
 64
 Moreover, there is no evidence in the record upon which a trier of fact could reject defendants' claims that plaintiff's inability to type was the true reason for her termination. Anderson points to the fact that shortly before her termination, Bill Wilhoite, the Director of the Division of Driver's License, offered her a position in the motorcycle safety program. Wilhoite subsequently withdrew the offer. When Anderson asked him why, she testified that Wilhoite told her that "[p]ersonnel has stopped [the job offer]." Tr. 111. Anderson testified that after she told him about the situation between her and Anders, Wilhoite stated, "[n]ow it all makes sense" and "[t]hey are covering up for [Anders], aren't they." Tr. 111-12. Wilhoite then described Anders as "a little boy in a man's suit." Tr. 110. However, when Wilhoite testified at the hearing on the preliminary injunction, he denied ever making the statements attributed to him by Anderson. Even if Anderson's testimony is credited over Wilhoite's, the record is clear that Anderson was not eligible for the position in the motorcycle safety program, because it was a merit position in the Transportation Cabinet, and Anderson was a nonmerit employee.
 
 
 65
 Finally, defendants argue that the district court erred in finding that the public interest in preventing sexual harassment and retaliatory discharge supported the issuance of the preliminary injunction. Defendants assert that the public interest supports the continued termination of Anderson because she cannot discharge the duties of executive secretary, and her reinstatement will produce bureaucratic incompetence and inefficiency. Defendants also argue that the executive secretary they hired to replace Anderson will be harmed because that person will have to be terminated.
 
 
 66
 In this instance, plaintiff Anderson has not shown the existence of any jobs which she would be qualified to perform if she were reinstated to the executive secretary position. This is of particular concern to us because Anderson herself admitted at the hearing on the preliminary injunction that her typing was very bad. Further, our research has not disclosed any cases in which a plaintiff was granted reinstatement via injunctive relief to employment in a position she admits she is not qualified to fill. Moreover, at oral argument, plaintiff's counsel was unable to identify any such cases for the court.
 
 
 67
 Accordingly, we conclude that the district court abused its discretion in granting the preliminary injunction based upon its weighing of the factors involved in the decision to grant the injunction.
 
 III.
 
 68
 For the reasons stated, the district court's judgment granting the preliminary injunction is REVERSED.
 
 
 
 [1]
 This court has jurisdiction over defendants' appeal. This court treats appeals from preliminary injunctions as appeals as a matter of right under 28 U.S.C. Sec. 1292(a)(1). United States v. Bayshore Assocs., Inc., 934 F.2d 1391, 1395 (6th Cir.1991)
 
 
 [2]
 Because we conclude that the district court had jurisdiction to issue the preliminary injunction under Title VII, we need not address the issue of whether the district court had the authority to issue the preliminary injunction under Sec. 1983 as well
 
 
 [3]
 The transcript of the preliminary hearing is not included in the joint appendix. The references Tr. are to the transcript itself, a copy of which was obtained from the district court
 
 
 [4]
 The notification provisions of COBRA apply to the states. See Williams v. New Castle County, 970 F.2d 1260 (3d Cir.1992)
 
 
 [5]
 In James B. Beam Distilling Co. v. Georgia, 111 S.Ct. 2439, 2446 (1991), the Court held that a newly announced rule of law that was applied to litigants before the Court must be retroactively applied by the courts to all cases not barred by res judicata or procedural requirements. Accordingly, the standard announced in Harris applies here